UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DALE ANDERSON et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CV-07-35-B-W |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION**

In an action tried before the Court under the Federal Tort Claims Act, the Court finds that Dale and Penny Anderson failed to demonstrate that Dr. Michael Lisanti, a general surgeon employed by the Department of Veterans Affairs, committed medical malpractice in performing laparoscopic gallbladder surgery on August 27, 2004, and grants judgment in favor of Defendant United States of America.

## I.   STATEMENT OF FACTS

### A.   A Good Citizen

As a veteran, husband, father, and good citizen, Dale Anderson does not deserve to be so unlucky. A native of New Sweden, Maine, Mr. Anderson is a fifty-eight year old Vietnam War veteran. In 1971, following his service in the United States Army, he returned to Aroostook County, Maine, where he worked for a time in home construction and as a heavy equipment operator. In 1984, he began a twenty-six year career working at the Bangor and Aroostook Railroad, first as a trackman and ultimately as a section foreman and equipment operator.

Mr. Anderson's first marriage ended in divorce on January 11, 1993. He has two children of that marriage. In 1996, he met Penny while attending a meeting of the Vietnam

Veterans of America and they married on July 6, 1996.  They have no children from this marriage.  Their social life centered on their local church and the Vietnam veterans association. Living in rural northern Maine, Mr. Anderson enjoyed the outdoors, and spent his free time fishing, hunting, and plowing snow.

**B.     A Series of Unlucky Events**

Although Mr. Anderson avoided physical injury in Vietnam, he came under fire and after the war, developed post-traumatic stress disorder.  Penny testified that her husband was easily startled by loud noises, but the more significant symptom was depression and she thought he suffered a guilt complex from surviving his tour of duty in Vietnam.  By temperament and outlook, Mr. Anderson is a worrier.  His personality may have contributed to the development of irritable bowel syndrome, a condition characterized by cramping, abdominal pain, and gaseous distension. His pessimism tended to express itself in a preoccupation with physical symptoms, a persistent sense of severe anxiety, and an inordinate fear of death.  In general, Mr. Anderson had an abiding concern that something bad was going to happen to him.

He was right.  On February 28, 2000, he had his first major misfortune.  Although he had sustained prior back injuries, this time he suffered a major accident, resulting in a concussion and severe back symptoms.  He was forced to leave work.  For Mr. Anderson, this was traumatic, because work was his life and he was forced to restrict some daily activities.  He fell into depression.

Then, in April 2003, a bizarre and inexplicable event occurred at the Lutheran Church in New Sweden.  Someone put arsenic in the church coffee, poisoning a host of churchgoers.  The poison had a varied impact among the small, cohesive congregation.  After drinking the arsenic-laced coffee, although many escaped with minor symptoms, one died and a number, including

Mr. Anderson, became deathly ill.  Mr. Anderson was taken to the local emergency room and transferred to the Eastern Maine Medical Center, where he underwent a prolonged course of intensive therapy.  His recovery was arduous and incomplete.  After discharge, he continued to experience peripheral neuropathy, a severe burning and numbness in his feet and legs, and his gait and stability were compromised by his inability to sense pressure in his feet.  In Mr. Anderson's words, he wobbled.  He also thought he had lost some of his mental capacity, forgetting things he would have remembered before the poisoning.

Just before his gall bladder operation in August 2004, Mr. Anderson suffered from post-traumatic stress disorder, anxiety, depression, irritable bowel syndrome, low back problems, and peripheral neuropathy.  On August 27, 2004, he was to take a turn for the worse.

### C.    The August 27, 2004 Gall Bladder Surgery

In 2004, Mr. Anderson developed dull, but constant pain in the right upper quadrant of his abdomen.  In the summer, he underwent a gastroenterological consult and sonogram, which revealed the presence of several gallstones, one possibly located in the neck of the gallbladder. He was recommended for a laparoscopic cholecystectomy, the surgical removal of the gallbladder.  Mr. Anderson agreed to undergo the recommended surgery and traveled to the U.S. Department of Veterans Affairs Hospital in Togus, Maine, where the surgical procedure was performed on August 27, 2004 by Dr. Michael Lisanti assisted by Dr. Jan Bossart. Unfortunately, something went wrong: the common hepatic duct was severed near its intersection with the liver.  Termed a Bismuth Level III injury, this surgical complication was extremely serious and Mr. Anderson was quickly taken to the Maine Medical Center (MMC) where he underwent the first of a series of remedial surgical and medical procedures.  Mr.

Anderson's recovery has been slow, expensive, painful, difficult, and uncertain and he remains at significant risk for a host of potential complications, some of which are grave.

### D.     The Lawsuit

On March 14, 2007, Dale and Penny Anderson filed a complaint under the Federal Tort Claims Act against the United States of America and Michael Lisanti, M.D.[1]  *Compl.* (Docket # 1).  The case was tried before the Court from June 3-6, 2008; in addition to Mr. and Mrs. Anderson, a number of medical experts testified.[2]  On July 21, 2008, the Court heard oral argument.

### E.     An Anatomy Lesson

To describe the anatomy of the surgical area, it is helpful to get one's bearings.  If the body stands face front on a north-south-east-west axis, the head is north, the feet are south, the right is east, and the left is west.  The gallbladder is located in the eastern side of the abdomen, resting against the liver.  It looks like a mostly deflated balloon with its top running roughly toward the northeast and its neck proceeding southwesterly, emptying out in the small intestine.

The gallbladder harbors bile, which is produced by the liver.  Bile, which aids in the digestive process, travels from the liver down the hepatic duct and up the cystic duct to the gallbladder, where it is stored.   Upon eating, the bile runs down the cystic duct from the gallbladder to the common bile duct to the small intestine.  To visualize the anatomy of the ducts, the best analogy is to the trunk and branches of a tree.  Starting at the bottom of the trunk, the portion of the duct that takes bile into the small intestine is the common bile duct.  Traveling from the small intestine up the trunk toward the liver and the gallbladder, the common bile duct

---

[1] Dr. Lisanti has passed away.  On June 3, 2008, the Court granted an oral motion to dismiss him as a defendant, leaving the United States as the sole defendant.  *Oral Order* (Docket # 43).
[2] The Plaintiffs called as medical experts Drs. Thomas Gay, Robert Shaw, and Frederick Radke; the Defendant called Drs. James M. Richter, James Pomposelli, Karel Jan Bossart, Douglas Howell, and Lisa Ferzoco.

splits into two ducts.  The branch of the duct that connects to the gallbladder is called the cystic duct; it proceeds generally northeast toward the gallbladder.  The branch of the duct that connects to the liver is called the common hepatic duct; it proceeds roughly due north.  As the common hepatic duct nears the liver, it branches again into the left and right hepatic ducts; each then enters the liver.

### F.      A Laparoscopic Cholecystectomy

To surgically remove a gallbladder, medical science has developed a procedure called a laparoscopic cholecystectomy.  Instead of cutting the patient's abdomen open and frankly extracting the gallbladder, the surgeon makes a few incisions in the stomach to allow the insertion of surgical instruments and a tiny video device.  Once the abdomen is entered, the surgeon identifies the gallbladder, the common hepatic duct, the cystic duct, and the common bile duct.  The surgeon sequesters and clips the cystic duct in two places – near the bottom of the gallbladder and further down the cystic duct, closer to the common bile duct.  The surgeon then uses scissors to cut the cystic duct between the two clips, freeing the gallbladder from the duct. The gallbladder, however, remains adhered to the liver by material one surgeon likened to Saran Wrap; using electrocautery, the surgeon burns away the sticky material, separates the gallbladder from the liver, a process often described as lysis, and removes it through one of the incisions.

### G.      A Recognized Complication – Injury to the Common Hepatic Duct

Unfortunately, Mr. Anderson suffered one of the recognized complications to laparoscopic cholecystectomy: an injury to the common hepatic duct.  Dr. Lisanti apparently clipped the common bile duct and cut the common hepatic duct near the liver.  He cut across the right and left hepatic ducts.  Medical science grades an injury to the hepatic duct as Bismuth I through IV, with I being the furthest from the liver and the least injurious and IV being the

closest to the liver and the most injurious.  Mr. Anderson suffered a Bismuth III injury, meaning that the hepatic duct was severed close to the liver itself, presenting additional complications, risks, and challenges.

### H.   The Medical Experts

#### 1.   Dr. Lisanti's Explanation

##### a.   The Operative Note

Dr. Lisanti's operative findings stated that "[t]here were extensive adhesions in the abdomen despite the patient's lack of previous surgery.  These included adhesions between the dome of the liver and the anterior abdominal wall and diaphragm." *Pls.' Ex.* 1 at VA 324.   The operation report states that, after the abdomen was entered:

> The gallbladder was now grasped.  Dissection of adhesions of omentum away from the gallbladder was performed.  Dissection proceeded down to the cystic duct, which was freed up in all directions and doubly ligated proximally with Weck clips and singly ligated distally.  The cystic duct was divided.  The right hepatic artery was in the field and the cystic artery branch from it was visualized and similarly ligated and divided.   Gallbladder was now freed up from its bed using cautery.  Gallbladder was removed through the midline incision.

*Id.* at VA 324-25.  The note closes by saying that the "patient returned to the Recovery Room, having tolerated the procedure well."  *Id.* at 325.

##### b.   Dr. Lisanti's Deposition

###### i.   The Surgery

During discovery, Dr. Lisanti was deposed and offered an explanation as to why he severed the hepatic duct.  He said that as he entered Mr. Anderson's abdomen, he encountered what he described as dense adhesions.  Although some degree of adhesion is anticipated due to Mr. Anderson's gallbladder disease, Dr. Lisanti thought Mr. Anderson had more adhesions than

would be expected for someone like Mr. Anderson, who did not have a history of abdominal surgery. He freed up those adhesions using electrocautery and visualized the gallbladder.

Once he isolated the gallbladder, he was able to identify the neck of the gallbladder and its connection to the cystic duct. During surgery, he observed that Mr. Anderson's cystic duct seemed short, leaving a limited piece of cystic duct between the gallbladder and the common bile duct, but he said that this is sometimes the case. Dr. Lisanti testified that he identified the cystic duct and clipped it, and that he probably put the uppermost clip right on the gallbladder. He testified that he then severed the cystic duct.

Having severed the duct that attaches the gallbladder to the common bile duct, he freed the gallbladder from the liver using electrocautery. He was able to extract the gallbladder in the standard fashion and when he removed it, he saw what he expected – a gallbladder with one clip on the cystic duct. This was significant to the doctor, because he said that it confirmed that the surgery was successful.

### ii.      Post-Surgical Gallbladder Examination

After receiving the news of Mr. Anderson's injuries, Dr. Lisanti could not imagine why the surgery had gone wrong and he decided to re-examine the gallbladder, which was stored in the pathology department. Upon re-examination, Dr. Lisanti saw what both he and the pathologist had not seen on initial examination – a cemented together cystic duct and a common hepatic duct stuck to the wall of the gallbladder. Dr. Lisanti testified that as much as three to four centimeters of the common hepatic duct were attached to the gallbladder. Once he was able to observe this condition in the pathology laboratory, Dr. Lisanti concluded that he had correctly identified and severed that cystic duct at the neck of the gallbladder, but that he had also severed

the hepatic duct and that this most likely occurred when he freed the gallbladder from the bed of the liver.

### iii.      Mirizzi's Syndrome

Upon post-surgically observing the gall bladder, Dr. Lisanti also came to the conclusion that Mr. Anderson had Mirizzi's Syndrome, a gallbladder condition characterized by extensive scarring and adhesion.  He said that Mirizzi's Syndrome is a common cause for laparoscopic complication.

### 2.      The Plaintiffs' Expert – Dr. Radke[3]

Frederick R. Radke, M.D., a board certified general surgeon, has been practicing general surgery at MMC for about twenty-five years.  He has performed about 1,500 to 2,000 laparoscopic cholecystectomies.  Dr. Radke has been involved in Mr. Anderson's case since early September, 2004, when he assisted in one of the surgical repairs to ameliorate the damage resulting from his August 27, 2004 surgery.  Dr. Radke then took over Mr. Anderson's care as his primary surgeon and has been involved in much of his subsequent treatment.

Dr. Radke expressed the opinion that Dr. Lisanti deviated from the standard of care for a general surgeon in severing the common hepatic duct resulting in a Bismuth III injury.  The nub of Dr. Radke's opinion was that to cut the common hepatic duct where he did, Dr. Lisanti was not where he should have been.  Dr. Radke acknowledged that this type of injury can occur even with surgeons who are in the prime of their abilities, but he was troubled by the high location of the injury.  He said that the fact the injury took place so far up into the bile duct confluence indicates that the surgeon was simply too far away from where he should have been.  In essence, he thought Dr. Lisanti was lost.

---

[3] Even though other medical experts testified, the Court describes the testimony of Drs. Radke and Pomposelli because their contrasting views encapsulate the points and counterpoints of this case.

To explain, when discussing the Bismuth scale of injury, Dr. Radke said that if the patient suffers a Bismuth I injury, even though the surgeon was not where he should be, the surgeon would not necessarily have been negligent.  However, the further up the common hepatic duct the injury occurs, the more likely it is that the surgeon was negligent.  Under Dr. Radke's view, a Bismuth II injury would be in a grey area; a Bismuth III injury, as here, would be indicative of malpractice; a Bismuth IV injury even more so.

Dr. Radke also discounted Dr. Lisanti's view that Mr. Anderson was suffering from Mirizzi's Syndrome, a condition that could help explain the surgical mistake.  Mirizzi's Syndrome is gallbladder condition characterized by inflammation, scarring, and adhesions.  If Mr. Anderson had Mirizzi's Syndrome, this condition would have made the surgery much more difficult, because the common bile duct would have been compressed by external pressure, usually by large stones inside the gallbladder.  Dr. Lisanti would have had a more difficult time visualizing the individual anatomic features and as the usual anatomy is plastered together, surgical identification and separation would have been more challenging.  Dr. Radke testified that he did not believe Mr. Anderson had Mirizzi's Syndrome, since there was no evidence that Mr. Anderson had the large gallstones associated with the syndrome and neither the operative note nor the pathology report describe conditions consistent with Mirizzi's Syndrome.

Dr. Radke offered two major alternatives for what happened during Mr. Anderson's surgery to cause this injury.  First, he thought that Dr. Lisanti may simply have misidentified the common bile duct for the cystic duct, clipped, and severed it.  Consistent with this theory, Dr. Radke testified that he observed a clip on the distal portion of the common bile duct and he found that the proximal bile duct had been severed right at the confluence.  He thought that, as

9

Dr. Lisanti moved up to release the gallbladder from the bed of the liver, he dissected the hepatic duct.

Dr. Radke offered another possibility.  He explained that standard operating procedure is to clip the area of the cystic duct at the neck of the gallbladder, clip the cystic duct below, and then cut the duct between the clips.  Reading Dr. Lisanti's operative note, Dr. Radke thought that Dr. Lisanti believed he was operating on the cystic duct, but as it turned out he had divided the common bile duct – at least in part – and part of the cystic duct.  Under this alternative, Dr. Radke said when Dr. Lesanti looked at the area between the clip near the gallbladder and the clip on the common bile duct, it appeared in his two-dimensional view to be a straight line.  However, he could not actually see behind the cystic duct and the cystic and hepatic ducts may have been lying on top of each other.  If so, when he cut the cystic duct, he also cut the underlying hepatic duct, causing the injury.  Dr. Radke acknowledged that if the injury occurred in this fashion, the surgeons, like Dr. Lisanti, who commit this type of surgical error, are convinced, based on their limited two-dimensional view, that they are only on the cystic duct, when they in fact are not.

### 3.    The Defendant's Expert - Dr. Pomposelli

James J. Pomposelli, M.D. testified that Dr. Lisanti did not breach the standard of care of a general surgeon in transecting the common hepatic duct during the laparoscopic cholecystectomy in Mr. Anderson's case.  Dr. Pomposelli is a board certified general surgeon at the Lahey Clinic and director of liver transplantation at the University of Massachusetts/Memorial Medical Center.  Like Dr. Radke, Dr. Pomposellli has performed numerous laparoscopic cholecystectomies; he performs about one hundred cases a year and has done so since 1990, which would make his experience roughly equivalent to that of Dr. Radke.

In addition, as director of liver transplantation, Dr. Pomposelli is in charge of one of the largest liver transplant programs in the United States.  He is the principal recipient surgeon for all live donor liver transplants in the Country, making him one of the most experienced liver transplant surgeons in the world today.  Dr. Pomposelli's vast experience with liver transplants is significant because his surgical concentration is in the area of the body where this surgery took place.  Dr. Pomposelli testified that just as the courtroom is like a trial lawyer's office, this area of the body was his office.  He said he lives there.

Dr. Pomposelli began by pointing out that the known transection rate of the common hepatic duct in laparoscopic cholecystectomies is point five percent.  He noted that this error rate has been a matter of concern within the medical community, particularly in view of the disastrous results to the patient, and it has been the subject of numerous medical studies.  Dr. Pomposelli said that initially it was thought that the point five per cent error rate was a function of surgical inexperience.  But, the hepatic duct transection rate has remained unchanged since the procedure was first introduced in the 1980s.  This complication rate has persisted despite the fact that this type of gallbladder surgery is one of the most common surgeries performed in the United States.  Dr. Pomposelli testified that this type of operation is performed 750,000 times a year in this Country.  Given the frequency of the surgery and the steadiness of the error rate, Dr. Pomposelli made the point that if a hepatic duct transection is malpractice, it continues to occur in point five percent of all gallbladder laparoscopies, roughly 3,750 times each year.  He implied that it is simply not sensible to conclude that the surgeons of this Country are so consistently negligent.

Further, despite millions of surgeries, the enhancement of surgical experience, and advancements in medicine, the percentage of transections of the hepatic duct in laparoscopic

cholecystectomies has remained unchanged. Dr. Pomposelli testified that this type of complication has become an expected outcome of the procedure. He said that ninety-nine and a half percent of the time the surgeon performing this procedure is perfect, but one half of a percent of the time, the surgeon is not perfect. This was one of those times. In fact, Dr. Pomposelli himself severed the hepatic duct in performing a laparoscopic cholecystectomy. In a notable expression of surgical confidence, he said that given his level of expertise and experience, if it could happen to him, it could happen to anyone.[4]

Dr. Pomposelli's main point was that the very nature of a laparoscopic cholecystectomy helps explain why there is an irreducible rate of hepatic duct transections in this type of procedure. First, he noted that, although the surgical area appears large in anatomic drawings, it is actually very small – only a few centimeters square – and he implied that slight slips which could be insignificant in other areas of the body can have major ramifications here. For example, he agreed that the ducts themselves are only slightly wider than spaghetti. Second, he testified that this area contains the most highly variable region of anatomy in the human body. Again, unlike anatomy book drawings, there is no such thing as a normal anatomic pattern within this region. Also, the typical patient has fat and intestine stuck to the gallbladder, which can obscure the surgeon's view and make the surgery more difficult. Furthermore, to be a candidate for gallbladder surgery, the patient has necessarily presented with a history of gallbladder disease, which often causes adhesions and inflammation. Moreover, the laparoscopic nature of the surgery requires the surgeon to deal with a three-dimensional environment with a two-dimensional projection. The videocamera inside the stomach projects on a television-style

---

[4] Dr. Pomposelli's experience was shared by one of the other medical expert witnesses, Dr. Lisa Ferzoco. Dr. Ferzoco specializes in general and laparoscopic surgery and teaches at both Harvard and Tufts medical schools. She testified that she was involved in an emergency cholecystecomy, where the surgeons, including her, clipped and divided the common bile duct, mistakenly thinking it was the cystic duct.

screen that is necessarily two dimensional.  The gap between what the surgeon sees on screen and what is happening in the body can lead to misperceptions and misidentified structures.

Dr. Pomposelli did not, however, absolve the surgeon in every hepatic duct transection. The difficulty, he agreed, is to distinguish between an adverse result that occurred despite surgical competence and one that occurred because of surgical incompetence.  He pointed first to the individual surgeon's experience with hepatic duct transections.  If the surgeon has a history of severing the hepatic duct, it is more likely he was performing the surgery incompetently. Here, the United States presented evidence that this was Dr. Lisanti's first hepatic duct transection during a laparoscopic cholecystectomy.

A second factor is the extent of the damage caused by the surgery.  Dr. Pomposelli said that he has seen the whole gamut.  He once attempted to correct a gallbladder surgery where the doctor transected the entire hilum of the liver, ultimately causing the patient's death.  Here, on a scale of one through ten, Dr. Pomposelli rated Mr. Anderson's injury a three.

Dr. Pomposelli pointed out that Dr. Lisanti's operative note reflected no problems during surgery and it was only after surgery that the hepatic duct transection became evident.  If Dr. Lisanti had truly wandered off during his surgery, it would have been reflected in the operative note.  For example, Dr. Pomposelli explained that if the doctor resects the gallbladder, there will be a gush of bile and the surgeon will have to immediately react to staunch the flow.  With an hepatic duct injury, because the surgeon cuts by using cautery, which burns and seals, the severed duct is so small that it is instantly sealed when severed, thus giving the surgeon no visual cue that something went wrong.  The absence of any suggestion of obvious untoward occurrence during surgery is some evidence that the error was not a deviation from standard practice.

A final factor is the preexisting condition of the patient.  Although the medical profession never blames the patient for a surgical injury, on occasion the patient's presentation can make the surgery more difficult and can help explain why a complication occurred.  For example, if the patient is markedly obese, the anatomic structures are covered and wrapped in fat, the surgeon has to untangle the fat from the organs, increasing the risk of error.  Mr. Anderson was not overweight; his major preexisting risk factor was gallbladder disease, which is always a preexisting risk for gallbladder surgery.

At this point, it may serve to further describe the impact of the patient's predisposition on the surgery.  The clarity of typical anatomic drawings is not available during surgery.  Each patient presents with fat, inflammation, scarring, and other individualized factors that can make the surgical area opaque and difficult to clearly visualize.  To minimize these problems, surgeons apply traction and counter-traction, pulling the organs back and forth with the help of the surgical assistant, to open up cloudy areas, divide the extraneous, and identify the structures. The surgeon clears the way either with scissors or with electrocautery, which fries the tissue, in an effort to locate certain anatomic landmarks.

For example, once the surgeon visualizes the gallbladder and is in the process of looking for the cystic duct as it emerges from the gallbladder, the doctor will often seek out an anatomical feature known as Calot's triangle, a space framed by the cystic artery, the cystic duct, and the hepatic duct.  But, Dr. Pomposelli noted that after Mr. Anderson's problem was discovered, Dr. Lisanti had gone down to the pathology lab to examine the gallbladder specimen and observed that pieces of the common duct were actually adhered to the gallbladder itself.  Dr. Pomposelli thought that it was possible that the gallbladder and the cystic duct were aligned together and encased in a cocoon of adhesions.  Thus, when Dr. Lisanti looked for Calot's

14

triangle, there was no triangle to be found.  Inflammation and adhesions had reduced the triangle to a slit, forcing Dr. Lisanti to make his best judgment about what anatomical feature the screen revealed.

Finally, in his operative report, Dr. Lisanti said that he encountered dense adhesions, which implies a greater degree of adhesions than he might normally encounter.  But, Dr. Pomposelli acknowledged this factor is equivocal, since many gallbladder surgical patients have dense adhesions.

## II.    DISCUSSION

There is no dispute that in severing the hepatic duct, Dr. Lisanti committed a surgical error.  A successful laparoscopic cholecystectomy severs the cystic duct, not the hepatic duct, and Dr. Lisanti, who was deposed before he passed away, acknowledged that it was a deviation from the standard of care to sever the hepatic duct.[5]  The dispute is whether this surgical error constituted medical malpractice.

### A.    An Evidentiary Issue

During trial, the Defendant attempted to admit through its expert witnesses a number of scholarly articles from medical literature, describing the hepatic transection complication rate in laparoscopic cholecystectomies and evaluating the causes for this complication.  The Plaintiffs objected, citing Rule 803(18).  The Court deferred ruling.

Rule 803(18) provides:

The following are not excluded by the hearsay rule . . . .  To the extent called to the attention of an expert witness upon cross-examination or relied upon by the

---

[5] The Plaintiffs point to Dr. Lisanti's testimony that in severing the hepatic duct, he performed substandard surgery, as an admission of negligence.  However, earlier in his deposition, the doctor denied having deviated from an appropriate standard of care in performing the surgery.  It is difficult for a surgeon to assert that in cutting the hepatic duct, he was performing the surgery the way it is supposed to be performed.  It is another matter, however, to conclude that Dr. Lisanti was admitting that he committed malpractice.  The Court views the doctor's testimony as confirming that the surgery did not go right, not that he committed malpractice.

> expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Fed. R. Evid. 803(18).  The articles from the medical journals fulfilled the prerequisites for admission and are admissible, but only in a limited way.

The Plaintiffs objected to the articles being "received as exhibits."  The limited admissibility of learned treatises as exhibits "ensures that the jurors will not be unduly impressed by the treatise, and that they will not use the text as a starting point for conclusions untested by expert testimony."  5-803 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.20[1] (Joseph M. McLaughlin, ed., 2d ed. 1997); *see Finchum v. Ford Motor Co.*, 57 F.3d 526, 532 (7th Cir. 1995); *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1413-14 (10th Cir. 1990).  The Rule's constrained use of learned treatises imposes a valuable discipline on the factfinder, whether jury or judge, to avoid playing expert and restricts the factfinder to those technical matters that have been illuminated by expert testimony.  The Court sustains the Plaintiffs' objections to Defendant's exhibits 35, 36, 39, and 53 and will consider those exhibits only to the extent they have been read into evidence in accordance with the Rule.

### B.    Dr. Lisanti's Credibility

The Plaintiffs attack Dr. Lisanti's testimony that after the surgery, he viewed the gallbladder and noticed the cystic and hepatic ducts adhered to the wall of the gallbladder.  They point out that Dr. Lisanti's testimony is wholly uncorroborated.  The pathology report makes no mention of this condition and the report was never later corrected to reflect this significant finding.  They observe that Dr. Lisanti failed to make an addendum in the medical record, leaving his observations entirely undocumented.  They also note that when asked why he failed

16

to make an addendum, Dr. Lisanti replied that he just did not think to do it, and then explained that he knew the injury was there and nothing he added to the record at that point would have made a difference.  Finally, the Plaintiffs contend that Dr. Lisanti had made a later addenda in other medical records.  Adding these factors together, the Plaintiffs urge the Court to view with skepticism Dr. Lisanti's testimony about his solo post-operative gallbladder findings.

The Court declines to discount Dr. Lisanti's testimony on this issue.  First, although it may be logical that the standard in the medical profession is to make an addendum regarding a surgeon's post-operative analysis of an excised organ, there is no evidence in this record about the standard practice.  Absent such evidence, the Court is reluctant to draw any conclusion about whether Dr. Lisanti's failure to make a post-operative addendum undercuts his credibility.[6] Second, Dr. Lisanti testified that he mentioned his findings to Dr. Bossart, but Dr. Bossart, who testified at trial, was not asked anything about whether he recalled such a conversation with Dr. Lisanti.  Again, absent other evidence that undercuts Dr. Lisanti's statements, the Court is not prepared to assume that the conversation with Dr. Bossart did not take place.  Third, other than the pathology report, there is no further evidence from Dr. Raymond C. Ricardo, the pathologist who examined the gallbladder post-operatively, about whether he agreed with Dr. Lisanti's

---

[6] With this said, the Court agrees with the Plaintiffs that on its face Dr. Lisanti's explanation for why he did not amend the record is puzzling.  Regardless of whether it rose to the level of malpractice, the surgery went very wrong, Mr. Anderson was going to suffer grievously as a result, and, as Dr. Pomposelli reiterated, it is fundamental to medicine to learn and have others learn from untoward results to avoid them in the future.  In this context, to make such a significant post-operative finding and establish no official record of it seems unusual.  To fail to have the finding corroborated by other physicians and miss the opportunity for the surgical and pathology departments to learn from this unfortunate episode contradicts the premise of peer review.  But, in making these comments, much of what the Court is relying on is inference, not direct evidence, and the record is virtually bare on this issue.  On balance, the Court cannot conclude that Dr. Lisanti was lying about what he found, despite its misgivings about what he did or did not do once he found it.  During oral argument, the Plaintiffs suggested there is a middle ground between concluding that the doctor was lying or telling the truth.  Perhaps, but to reach that middle ground, the evidence and the logical inferences to be drawn from the evidence would have to be stretched beyond the breaking point.

findings.[7]   Fourth and most significantly, to discount Dr. Lisanti's testimony on this issue, the Court would have to conclude he was lying about re-examining the gallbladder, and discovering and describing the adhesions.   There is no other explanation.   Either Dr. Lisanti went to the pathology department and observed the duct adhesions, as he described them, or he did not.   If he did not, he lied about it; if he did, he told the truth.

Based on the evidence in this record, the Court cannot find that Dr. Lisanti lied under oath about his post-surgical observations of the gallbladder and accepts his testimony on that point as true.

### C.      The Law:  General Principles

The Federal Tort Claims Act provides, "the United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."  28 U.S.C. § 2674.  The Plaintiff bears the burden to establish the liability of the United States "by showing that a private individual would be liable under state law – Maine law, in this case – for similar conduct in the same circumstances."  *Clement v. United States*, 772 F. Supp. 20, 26 (D. Me. 1991).  The Plaintiffs' cause of action must be "tried by the court without a jury."  28 U.S.C. § 2402.

To prove a claim of medical malpractice under Maine law, the Plaintiff must establish: "(1) the appropriate standard of medical care, (2) the defendant's deviation from that recognized standard, and (3) that the conduct in violation of that standard was the proximate cause of the plaintiff's injury."  *Ouellette v. Mehalic*, 534 A.2d 1331, 1332 (Me. 1988); *Cox v. Dela Cruz*, 406 A.2d 620, 622 (Me. 1979); *Caron v. Pratt*, 336 A.2d 856, 858-60 (Me. 1975).  Ordinarily, to sustain his burden, a plaintiff must produce expert testimony.  *Cox*, 406 A.2d at 622; *Cyr v.*

---

[7] Dr. Lisanti testified that Dr. Ricardo was a *locum tenens*, which is Latin for "place-holder" and usually refers to a visiting physician with temporary hospital privileges.

*Giesen*, 150 Me. 248, 251, 108 A.2d 316, 318 (1954).  The standard of care applicable to the Defendant and its agents is "that degree of skill and knowledge ordinarily possessed by physicians in [the physician's] branch of medicine . . . ."  *Clement*, 772 F. Supp. at 26 (quoting *Downer v. Veilleux*, 332 A.2d 82, 87 (Me. 1974)).

It bears mention that this is not a *res ipsa loquitur* situation where negligence can properly be inferred from "the mere occurrence of the event."  *Poulin v. Aquaboggan Waterslide*, 567 A.2d 925, 926 (Me. 1989).  To the contrary, the medical experts for both parties acknowledged that a transection of the hepatic duct is a recognized complication of a laparoscopic cholecystectomy, which they agreed occurs at a small, but predictable rate.[8]  They confirmed that this complication can happen to the very best surgeons, even surgeons in the prime of their abilities.  Thus, the fundamental nature of the surgery – without any surgical negligence – may result in an hepatic duct transection.

**D.    The Burden of Proof**

The Plaintiffs bear the burden to prove that, in performing Mr. Anderson's laparoscopic cholecystectomy, Dr. Lisanti deviated from the degree of skill and knowledge ordinarily possessed by physicians performing this surgery and they must also establish a causal link between the alleged acts of malpractice and the resulting sequelae.  Turning first to the second criterion, the causation element for Mr. Anderson's injuries is especially clear.  If Dr. Lisanti was guilty of committing malpractice in severing the hepatic duct at the confluence of the right and left hepatic ducts, Mr. Anderson has unequivocally demonstrated that he directly suffered and will continue to suffer grievous injuries.  The focus of this law suit is the first element:  whether Dr. Lisanti committed malpractice.

---

[8] Dr. Radke thought it was three per thousand or somewhere in that range; Dr. Pomposelli thought it was five per thousand; Dr. Ferzoco testified that ductal injuries occur anywhere from point four to point eight percent of the time.

### E.    Two Inapplicable Possibilities

The fact that the medical experts agree that a transected hepatic duct can occur without malpractice, it does not necessarily follow that the surgical error in this case occurred without malpractice.  To differentiate between surgery within and outside an acceptable professional standard, the evidence points to two factors:  (1) the surgeon's history; and, (2) the surgery itself.

Turning to the first issue, there is no evidence that Dr. Lisanti was anything but a competent surgeon or that he had difficulty with this procedure.  Dr. Lisanti was graduated from Harvard Medical School and was a board certified general surgeon since 1973.  Dr. Lisanti testified that the Andersons' law suit was the first time he had ever been sued for malpractice.  During his nearly twenty-five years as a general surgeon, he had only one other malpractice claim, which was denied and dropped.  Regarding the procedure itself, Dr. Lisanti previously performed approximately one hundred gallbladder surgeries and this was the first time he had severed the hepatic duct.  The Court finds that Dr. Lisanti was a competent surgeon both generally and specifically with this type of procedure.

Turning to the second factor, there is also no evidence that the surgery itself went dramatically wrong.  Dr. Pomposelli described instances where it is clear the surgeon got lost and went far afield, for example, slicing into the liver itself, or where the surgeon mislabeled what he had transected.  Here, apart from severing the hepatic duct, the Court finds that the surgery itself does not necessitate an inference of malpractice.  In sum, the Court finds that without more evidence neither Dr. Lisanti's history as a surgeon nor his performance of this operation as a surgeon justifies an inference of malpractice.

### F.    The Surgery:  What Happened and Whether it Constitutes Negligence

#### 1.    An Irreducible Opacity

The evidence points to two possible ways Dr. Lisanti severed the hepatic duct: as he cut the cystic and/or common bile duct or as he lysed the bed of the liver.[9]  The evidence does not allow a finding as to which of these two scenarios, cutting or lysing, is more likely.[10]  The question, therefore, devolves into whether either constitutes malpractice and the resolution of this question returns to why laparoscopic cholecystectomies have retained such a stubborn level of hepatic duct complication.

The doctors concurred about many of the relevant factors that lead to this unfortunate complication.  A primary reason is the lack of clarity that arises from the transposition between a three-dimensional body to a two-dimensional screen.  Even with the most straightforward gallbladder surgery, the surgeon is often unable to clearly see the anatomical features.  To try to identify the anatomic structure, he has to rotate and move the equipment around the surgical area and with the aid of the surgical assistant, he places the body parts in traction and counter-traction – essentially pulling and pushing them around – to try to identify landmarks.  Despite these surgical techniques, there seems to be an irreducible opacity because of the inherent limitations of the laparoscopic equipment.  This opacity can be compounded by individual anatomic variation and by the individual disease process.  The expert witnesses' descriptions of what they encounter as they enter the area of the gallbladder demonstrate why gallbladder surgery carries an inescapable degree of inexactitude.

---

[9] Dr, Lisanti testified he cut the cystic duct; Dr. Radke said Dr. Lisanti cut either the common bile duct or the cystic duct at or near the confluence of the common bile duct and the cystic duct.  The evidence is, therefore, conflicting as to whether Dr. Lisanti cut the cystic duct only, the common bile duct only, or portions of both of them.  The Court's decision does not require it to resolve this conflict.  To be as precise as this degree of imprecision allows, the Court refers to the area of the cut as "the cystic and/or common bile duct."

[10] At oral argument, the Court pondered whether the evidence that the remnants of the hepatic duct were cauterized favored the theory that the transection took place when the liver bed was separated, since the surgeon uses eletrocautery to lyse the liver bed from the gallbladder, but scissors to transect the cystic duct.  However, Dr. Radke said that he did not know whether the cauterization of the hepatic ducts happened during Dr. Lisanti's surgery or during the Maine Medical Center repair attempt.  The two possibilities remain in equipoise.

Whether the transection in Mr. Anderson's case occurred during cutting or lysing, the technological limitations of the equipment and the anatomic challenges of this area of the body likely played a role.  If Dr. Lisanti injured the hepatic duct as he was cutting the cystic and/or common bile duct, one explanation for the error is that the hepatic duct was hidden behind the cystic and common bile ducts and as Dr. Lisanti cut the apparent duct, he also cut the hidden duct.  Dr. Radke gave a good explanation for how this could happen.  He said that the two-dimensional nature of the surgeon's vision allows him to look directly at the cystic duct, but due to his lack of depth perception, he cannot see behind the cystic duct to observe the hepatic duct.  In fact, he said that the two ducts may have been lying right on top of each other.  Dr. Radke even testified that quite often the surgeon does not actually see the common hepatic duct; rather, the surgeon identifies the cystic duct as proceeding from the gall bladder and is convinced that he is visualizing the correct duct.

In support of this explaination theory, the Court has accepted Dr. Lisanti's testimony that a portion of Mr. Anderson's cystic duct was cemented together with the hepatic duct and stuck to the wall of the gallbladder.  Dr. Lisanti's observation explains why he thought Mr. Anderson's cystic duct looked short, since the appearance of a shorter duct is consistent with some of it being adhered to the wall of the gallbladder.  This may also explain why Dr. Lisanti clipped the common bile duct.  The standard operating procedure is to place two clips on the cystic duct.  But, since Mr. Anderson's cystic duct was crimped by adhesions, when Dr. Lisanti clipped the common bile duct, it is consistent with the shortened cystic duct that he thought he was at the cystic duct.[11]  This anomaly is consistent with a severing of the hepatic duct,[12] because if the two

---

[11]  Dr. Ferzoco and her surgical team has also misidentified the common bile duct for the cystic duct and severed the common bile duct.

[12]  Dr. Lisanti rejected the term anatomic anomaly to describe what he encountered.  He said that the plastered together cystic and hepatic ducts were consistent with inflammation caused by the disease process.

ducts were cemented together at the wall of the gallbladder, the hepatic duct would have been pulled in tighter to the cystic duct than normal, and when Dr. Lisanti transected the common bile duct, he could well have cut the hidden hepatic duct at the same time.[13]

The other possibility is the lysis injury.  Under this theory, Dr. Lisanti transected the hepatic duct as he used electrocautery to free the gallbladder from the liver.  Each of the surgeons, including Dr. Lisanti, thought this was possible.[14]  In the clearly identified anatomy of a Netter drawing, using the standard procedure, once the cystic duct has been severed and the cystic artery has similarly been identified, transected, and clipped, the surgeon can free the gallbladder from the liver bed without encroaching on the hepatic duct, because the duct is safely off to one side.  But, as the cystic and hepatic ducts were glued together, the shortened hepatic duct may have been much closer to the gallbladder and when Dr. Lisanti proceeded with electrocautery toward the bed of the liver, he may have inadvertently dissected the hepatic duct.

Under either scenario, the weight of the evidence points away from substandard surgery: (1) the persistence of hepatic duct transections in a low, but consistent percentage of laparoscopic cholecystectomies; (2) the concurrence of the medical experts that this complication can occur with the very best surgeons;[15] (3) the limitations of laparoscopic equipment in translating three dimensional anatomy to a two dimensional screen; (4) the post-surgical

---

[13] It does not appear that the Plaintiffs are claiming that Dr. Lisanti thought that the hepatic duct was the cystic duct and mistook the liver for the gallbladder, snipping the hepatic duct at the confluence of the right and left hepatic ducts, when he thought he was cutting the cystic duct near the gallbladder.  If that had occurred, Dr. Lisanti would clearly have been very lost, mistaking the liver for the gallbladder.  But, the evidence does not support such a theory nor is it being pressed.

[14] In Dr. Lisanti's deposition, the following exchange appears:

    Q.  Do you understand from either talking to Dr. Gay, looking at the records, whatever you've looked at from Dale that, in fact, what happened in this case was that you cut, transected the common hepatic duct right at the confluence of the right and left hepatic ducts?
    A. This is after I had already divided the cystic duct.

Pls.' Ex. 3, *Dep. of Dr. Lisanti* at 33:6-12.

[15] In fact, as noted earlier, both Drs. Pomposelli and Ferzoco, two surgeons with impeccable credentials, with academic appointments, and with extensive gallbladder surgical experience, had had similar complications with this type of surgery.

presence of a cemented together cystic duct and hepatic duct on the wall of the gallbladder; (5) the likelihood that Dr. Lisanti cut the cystic and/or the common bile duct; (6) the clip on the common bile duct, which is consistent with a crimped cystic duct; (7) Dr. Lisanti's observation that Mr. Anderson had a short cystic duct - also consistent with a crimped cystic duct; (8)  Dr. Lisanti's testimony that when he extracted the gallbladder, all he had was the gallbladder with a clipped cystic duct and nothing else; and, (9) the absence of positive findings in the pathology report that varied from Dr. Lisanti's description of what happened all support the Court's conclusion that Dr. Lisanti was not negligent.[16]

### 2.    The Bismuth III Question

A final unresolved factual issue is the divergence of opinion between two respected surgeons on whether the area of the injury – near the confluence of the left and right hepatic ducts – is itself sufficient to conclude that Dr. Lisanti committed malpractice.  The Plaintiff's main expert witness, Dr. Radke, held the view that Dr. Lisanti was simply too far away from where he should have been – too far up the hepatic duct.  But even he expressed this opinion with self-described trepidation, in part because he acknowledged the inherent difficulty of this procedure and the long-term persistence of this same percentage of error.  The Defendant's expert, Dr. Pomposelli, unequivocally disagreed and opined that Mr. Anderson's Bismuth III injury was not indicative of malpractice.[17]

The Court returns to the two possibilities – cutting or lysing.  If the hepatic duct was in fact, as Dr. Radke hypothesized, cut as it was hidden under and partially plastered onto the cystic

---

[16] The Court acknowledges that this last factor is mixed, since the pathology report did not mention any cohesion of the hepatic and cystic ducts to the wall of the gallbladder.  The point is that the pathology report did not contain any positive findings that directly contradict these conclusions.
[17] Sometimes an expert's equivocation reflects deeper contemplation.  Here, however, Dr. Radke clearly struggled in arriving at his conclusion; his trepidation mirrors the inherent difficulties with this procedure, and by extension, the inherent difficulties with the Plaintiffs' theory of liability.

duct, the location of the hepatic duct transection would be largely fortuitous. Further, if the duct was hidden, as he hypothesized, there is no evidence that the distal portions of the hepatic duct are more hidden than the part of the hepatic duct nearer the liver. Yet, Dr. Radke opined that a Bismuth I or II injury would not be indicative of substandard surgery, but a Bismuth III injury would be.[18] Further, if Dr. Radke were correct, it is logical that the percentage of Bismuth injuries would decrease as the surgeon neared the liver, since one would expect that competent surgeons would more often be just a little lost instead of very lost. But, the opposite is true. The medical literature reveals roughly an even distribution of Bismuth injuries from Bismuth I through Bismuth IV, suggesting that the level of injury is more fortuitous than negligent.

Dr. Radke's opinion would be more convincing if Mr. Anderson's hepatic duct were normal and stretched out its usual length, and the difference between the bottom and the top of the duct more indicative of losing one's way. But, if the hepatic duct is hidden from view and a portion of the hepatic duct is plastered to the gallbladder wall, a blind Bismuth I cut is as much a happenstance as a blind Bismuth III cut. Once the Court accepts, as it has, Dr. Lisanti's testimony that the cystic and hepatic ducts were stuck to the wall of the gallbladder, the Court finds unpersuasive Dr. Radke's view that the Bismuth III injury demonstrates that Dr. Lisanti was negligent.

### 3.    The Medical and Legal Standards

At oral argument, sensing the Court's view, the Plaintiffs made an urgent plea to consider what they termed a divergence between the medical and legal standards. They contended that

---

[18] The doctors seem to be discussing minute distances. Dr. Pomposelli testified that this area of the body is just a few centimeters square. There is no evidence about the normal length of an hepatic duct or the actual distance between a Bismuth I, II, III, and IV injury. The Court can infer that there is a short distance between a Bismuth II injury, which Dr. Radke said was not indicative of malpractice, and a Bismuth III injury, which he said was indicative of malpractice. But, it remains unconvinced that these short distances, however minute, should determine whether a surgeon is guilty of malpractice.

even if the medical profession is willing to explain away the devastating injuries Mr. Anderson sustained, the law holds surgeons to a higher standard. Though forcefully presented, the notion that there is a dichotomy between medical and legal standards is plainly wrong. The law of medical malpractice incorporates the applicable medical standards; to prevail the Plaintiffs are required to demonstrate "(1) the appropriate standard of medical care, (2) the defendant's deviation from that recognized standard, and (3) that the conduct in violation of that standard was the proximate cause of the plaintiff's injury." *Ouellette*, 534 A.2d at 1332. The Court cannot accept the Plaintiffs' urgent argument that the standard under the law diverges from the appropriate standard of medical care. The legal standard encompasses the medical standard.

### G.      Summary

The Plaintiffs have not proven that in performing the August 27, 2004 laparoscopic cholecystectomy on Mr. Anderson, Dr. Lisanti deviated from the recognized standard of care and, therefore, the Court denies their claim and grants judgment to the Defendant. The Court is extremely sympathetic with Mr. Anderson, who stoically endured a surgical injury not of his own making, and is aware that its decision compounds his string of bad luck. Unlucky medically, he is now also unlucky legally for sustaining a medical injury that does and did occur without malpractice. The Court's conclusion works a harsh result in view of the horrendous problems Mr. Anderson suffered following surgery and the real potential that those problems will continue, and perhaps worsen; nevertheless, the law requires that liability be resolved before damage and based on this record, the Plaintiffs have failed to prove the professional negligence of the Defendant.

### III.    CONCLUSION

The Court FINDS that the Defendant is not liable to the Plaintiffs Dale and Penny Anderson under the Federal Tort Claims Act and GRANTS judgment against the Plaintiffs Dale and Penny Anderson and in favor of Defendant United States of America.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 4th day of August, 2008